UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

R&L CARRIERS, INC. and
GREENWOOD MOTOR LINES, INC.
D/B/A R+L CARRIERS,

       Plaintiffs,

v.                                              Case No: 8:22-cv-2473-JLB-CPT

GERALD ROBINSON,

       Defendant.
_____

## **ORDER**

Plaintiffs R&L Carriers, Inc. ("R&L") and Greenwood Motor Lines, Inc. d/b/a R+L Carriers ("Greenwood") (together "Plaintiffs") bring this action against Defendant Gerald Robinson ("Mr. Robinson") alleging professional negligence (Count I) and negligent representation (Count II) based on environmental engineering and compliance services that Mr. Robinson provided Plaintiffs on behalf of his employer, Sierra Piedmont, Inc. ("Sierra"). (Doc. 1). Before the Court is Mr. Robinson's Motion to Dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction, which asserts that the dispute between Plaintiffs and Mr. Robinson is subject to a binding arbitration clause between Plaintiffs and Sierra. (Doc. 19). Plaintiffs have responded. (Doc. 27). Mr. Robinson also filed a Motion to Stay Discovery in this case pending arbitration. (Doc. 32). For the reasons below, the

Court finds that Mr. Robinson's Motion to Dismiss (Doc. 19) and Mr. Robinson's Motion to Stay Discovery (Doc. 32) are **GRANTED**.

## BACKGROUND

Plaintiffs[1] are national motor carriers that maintain facilities and vehicles all over the country to deliver freight. (Doc. 1 at ¶ 1). Plaintiffs' facilities contain storage vessels that are subject to rules and regulations from state and federal environmental protection agencies. (*Id.*) In order to ensure compliance with these rules and regulations, Plaintiffs hire engineers to review their facilities. (*Id.* at ¶ 2).

Mr. Robinson is a registered professional engineer in the environmental compliance industry who works for Sierra. (*Id.*) On or about October 3, 2016, Plaintiffs entered into a Master Services Agreement ("MSA") with Sierra under

---

[1] In their Complaint, Plaintiffs appear to distinguish between R&L and Greenwood in what the Court presumes to be an attempt to preclude enforcement of the Master Services Agreement ("MSA") against Greenwood. (*See, e.g.*, Doc. 27 at 7 n.2 ("In addition, Greenwood was not a signatory to the R&L-Sierra Piedmont Contract, so it cannot be enforced against Greenwood.")). However, nothing in the Complaint presents any indication that R&L and Greenwood are separate business entities or perform separate functions for the purpose of the claims alleged. For example, Plaintiffs state R&L and Greenwood are both corporations with their principal place of business at 600 Gillam Road, Wilmington, Ohio 45177. (*See* Doc. 1 at ¶¶ 11–12). And the Complaint states, "R&L Carriers entered into a Master Services Agreement . . . with Sierra Piedmont pursuant to which Sierra Piedmont . . . would provide environmental compliance services . . . which were then executed by R&L Carriers *or* Greenwood" indicating that the two provide services interchangeably. (*Id.* at ¶ 17). The Complaint also states that "Plaintiffs and Sierra Piedmont entered into [ ] statements of work . . . for Plaintiffs' facilities" indicating that R&L and Greenwood approached their relationship with Sierra Piedmont jointly for a shared benefit. (*Id.* at 5 n.1). Accordingly, the Court will refer to Plaintiffs together as Plaintiffs and will not distinguish between Greenwood and R&L as Plaintiffs have provided the Court with no basis to make such a distinction. To the extent the Court is misguided in its interpretation of the business relationship between Greenwood and R&L, Plaintiffs may clarify such matters in an Amended Complaint.

2

which Sierra would provide environmental compliance services and expertise for Plaintiffs' trucking terminal in Wilmington, Ohio (the "Wilmington Terminal") as well as other trucking terminals. (*Id.* at ¶¶ 2, 17). Mr. Robinson was charged with developing, maintaining, and certifying a Spill Prevention Control and Countermeasure ("SPCC") plan for the Wilmington Terminal. (*Id.* at ¶ 19). The SPCC plan aimed to prevent—or at least minimize—spills of hazardous material. (*Id.* at ¶ 3). Mr. Robinson reviewed the Wilmington Terminal's SPCC plan and on July 31, 2017, he certified that it complied with relevant regulations and good engineering practices. (*Id.* at ¶ 6).

On March 5, 2022, diesel fuel leaked from an opening in a tank at the Wilmington Terminal and seeped into a nearby creek. (*Id.* at ¶ 31). In July 2022, as a result of this spill, the United States Environmental Protection Agency ("USEPA") formally reviewed the Wilmington Terminal's SPCC plan and determined that there were more than 100 unique failures and defects in the plan. (*Id.* at ¶ 8). Plaintiffs have spent more than $75,000 correcting these defects. (*Id.* at ¶ 42).

On October 14, 2022, the USEPA filed an enforcement action in the United States District Court for the Southern District of Ohio against Plaintiffs. (*Id.* at ¶ 43). That action is based in part on the failures and defects in the Wilmington Terminal's SPCC plan. (*Id.*). Plaintiffs assert that Sierra and Mr. Robinson are responsible for those failures and defects given that Mr. Robinson certified the SPCC plan. (*Id.*). Plaintiffs now bring suit in this Court against Mr. Robinson for

3

(1) professional negligence and (2) negligent misrepresentation. Mr. Robinson has moved to dismiss Plaintiffs' Complaint asserting that "it seeks to circumvent a validly entered, binding arbitration clause, and the Complaint merely duplicates the underlying dispute currently being arbitrated in Georgia." (Doc. 19 at 4). Plaintiffs respond that the arbitration provision of the MSA does not apply to Plaintiffs' claims against Mr. Robinson. (Doc. 27 at 8–15). The Court takes up these arguments below.

## LEGAL STANDARD

Attacks on subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) come in two forms: facial or factual. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528 (11th Cir. 1990). Facial attacks on the complaint "require[ ] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id.* at 1525 (quotation omitted). "Factual attacks on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside of the pleadings, such as testimony and affidavits, are considered." *Id.* (quotation omitted).

The present case involves a factual attack, and not a facial attack because Mr. Robinson is not questioning whether Plaintiffs have "sufficiently alleged a basis of subject matter jurisdiction," *see id.* at 1525, but rather, whether the binding arbitration agreement applies to Plaintiffs' claims against him such that this Court

4

would not have subject matter jurisdiction over those claims as a matter of fact, (*see* Doc. 19 at 7–9).

"On a factual attack of subject matter jurisdiction, a court's power to make findings of facts and to weigh the evidence depends on whether the factual attack on jurisdiction also implicates the merits of plaintiff's cause of action." *Garcia v. Copenhaver, Bell & Assoc., M.D.'s, P.A.*, 104 F.3d 1256, 1261 (11th Cir. 1997). Where, as here, the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action, the court may "weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Lawrence*, 919 F.2d at 1529 (quotation omitted).

With these principles in mind, the Court will address whether the arbitration clause contained in the agreement between Plaintiffs and Sierra applies to Mr. Robinson, thereby divesting the Court of subject matter jurisdiction.

## DISCUSSION

Plaintiffs bring two claims against Mr. Robinson: (1) professional negligence and (2) negligent misrepresentation.  (Doc. 1 at ¶¶ 44–61).  For the reasons below, the Court finds that both claims are subject to the arbitration clause contained within the MSA between Plaintiffs and Mr. Robinson's employer, Sierra.

### I.     The arbitration clause in the MSA between Plaintiffs and Sierra applies to Plaintiffs' claims against Mr. Robinson.

The existence of an agreement to arbitrate between the parties is "simply a matter of contract." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). "The existence and terms of a contract must be proven by a preponderance of the evidence." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016). In construing arbitration agreements, courts apply state-law principles relating to contract formation, interpretation, and enforceability. *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367–68 (11th Cir. 2005). "The federal policy favoring arbitration, however, is taken into consideration even in applying ordinary state law." *Id.* at 1368 (citation omitted).

Here, Georgia law applies to the construction of the MSA between Plaintiffs and Sierra as the MSA states explicitly, "[t]his Agreement shall be governed, construed and enforced in accordance with the laws of the State of Georgia." (Doc. 1-1 at ¶ 26). Under Georgia law, where an arbitration clause invokes the Federal Arbitration Act, "although general state law principles of contract interpretation apply to the contract as a whole, 'due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration.'" *See AutoNation Fin. Svcs. Corp. v. Arain*, 264 Ga. App. 755, 756 (2003) (quoting *Volt Info. Sciences v. Bd. of Trustees of the Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)). The MSA states specifically that the arbitration clause contained therein, "shall be specifically enforceable under the Federal Arbitration Act." (*See* Doc. 1-1 at ¶ 25). Thus, the Court will follow the "federal substantive law of arbitrability, applicable to any arbitration agreement

6

within the coverage of the Act." *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626 (1985).

"Although arbitration is a contractual right that is generally predicated on an express decision to waive the right to trial in a judicial forum, [the Eleventh Circuit] has held that the lack of a written arbitration agreement is not an impediment to arbitration." *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 756–57 (11th Cir. 1993). This is because "there are certain limited exceptions . . . that allow nonsignatories to a contract to compel arbitration." *Id.* at 757. One such exception exists when, "under agency or related principles, the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories by avoided." *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999). "[W]here the alleged misconduct of the agent relates to the agent's behavior as an officer or director or the agent's capacity as an agent of the corporation, courts permit the agent to benefit from arbitration agreements entered into by his or her principals." *Axa Equitable Life Ins. Co. v. Infinity Financial Grp., LLC*, 608 F. Supp. 1330, 1345 (S.D. Fla. Mar. 31, 2009) (citation omitted). "The purpose of such rule is not only to prevent circumvention of arbitration agreements but also to effectuate the intent of the signatory parties to protect individuals acting on behalf of the principal in furtherance of the agreement." *Id.* (quotation omitted).

7

Here, the arbitration clause signed by Plaintiffs and Sierra is enforceable by Mr. Robinson, even though he was a non-signatory to the agreement because Mr. Robinson is Sierra's employee, he acted on Sierra's behalf to carry out the terms of the agreement, and Mr. Robinson's alleged professional negligence and negligent misrepresentation arose out of the contract between Plaintiffs and Sierra. In sum, like the Defendants in *Axa*, Mr. Robinson and Sierra share an agency relationship as employer and employee, and Mr. Robinson's alleged misconduct is indistinguishable from his capacity as an agent of Sierra. *See id.* at 1345; *see also Paine, Webber, Jackson & Curtis v. McNeal*, 145 Ga. App. 579, 582 (1977) (allowing a non-signatory securities broker to enforce an arbitration agreement to which his employer was a party, where the brokerage firm and the broker were sued as joint tortfeasors).

## II. Plaintiffs' various arguments that the arbitration clause does not apply are flawed.

While the Court's analysis could stop here, given that a court may "weigh the evidence and satisfy itself as to the existence of its power to hear the case" when considering a motion to dismiss for lack of subject matter jurisdiction that is not on the merits, the Court will assess Plaintiffs' arguments as to why this Court has subject matter jurisdiction over Plaintiffs' claims against Mr. Robinson below.

### A. Even if Florida law applied to the construction of the MSA, Florida law would still favor arbitration of Plaintiffs' claims against Mr. Robinson.

First, contending that this dispute is governed by Florida law, Plaintiffs argue that "a non-signatory to a contract containing an arbitration agreement

8

cannot compel a signatory to submit to arbitration." (Doc. 27 at 9 (citing *Rolls-Royce PLC v. Royal Caribbean Cruises LTD.*, 960 So. 2d 768, 770 (Fla. 3d DCA 2007))). But Florida caselaw is inapplicable to the construction of the MSA's arbitration clause because, as discussed above, the MSA states clearly that it is to be construed under Georgia law. (*See* Doc. 1-1 at ¶¶ 25–26).

Even if Florida law did apply, however, the Court's conclusion would not change as Florida courts have tended to favor arbitration where, as here, a defendant who is a non-signatory to an arbitration agreement is sued for alleged misconduct arising out of his duties as an agent of a signatory. *See, e.g., Bachus & Stratton, Inc. v. Mann*, 639 So. 2d 35, 36 (Fla. 4th DCA 1994) (explaining that because plaintiff's claims were based upon vicarious liability, "the trial court erred in ruling these claims were not subject to arbitration. Although [agent defendant] was not a signatory to the . . . agreement, a determination in arbitration that [plaintiff] had no claim against [principal defendant] would obviously preclude the successful litigation of these claims against [agent defendant]"); *Merrill Lynch, Pierce, Fenner and Smith, Inc. v. Melamed*, 453 So. 2d 858, 860 (Fla. 4th DCA 1984) (reversing the trial court's holding that employee was not entitled to arbitration given that he was not a signatory to the contract between his employer and plaintiff because "the language of the contract is broad enough to include persons within the respondeat superior doctrine"); *Koechli v. BIP Intern., Inc.*, 870 So. 2d 940, 944–45 (Fla. 1st DCA 2004) (holding that plaintiff was not permitted to deny non-signatory defendant agents the benefit of an arbitration agreement between defendant

9

principal and plaintiff because "[a] non-signatory agent should be permitted to compel arbitration . . . when the signatory to the contract containing a[n] arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract") (citation omitted).

In fact, one Florida case allowing a non-signatory employee to enforce an arbitration between his employer and the plaintiff is particularly germane to the facts alleged in this case. *See Post Tensioned Eng'g Corp. v. Fairways Plaza Assocs.*, 429 So. 2d 1212, 1214 (Fla. 3d DCA 1983). In *Post*, the plaintiff—the owner of a multiple office building project—sued its design engineer, its general contractor, and certain subcontractors of its general contractor after it discovered "severe and widespread structural defects in the construction of the buildings which [the plaintiff] contended, were caused by the negligence of the defendants." *Id.* at 1213. The plaintiff's contract with its general contractor contained an arbitration clause, but the subcontractors of the general contractor were non-signatories to this agreement. *Id.* The court found that the arbitration clause applied to the subcontractors "because [the contractor], under the doctrine of *respondeat superior*, was responsible for the negligence of its subcontractors, [and] a determination in arbitration that [the contractor] was not negligent would necessarily be a determination that [the contractor's] subcontractors were not negligent." *Id.* at 1214. Thus, because the issue subject to arbitration—namely, whether the building defects were a result of shoddy workmanship on the part of the general contractor

10

or its subcontractors—applied to both the general contractor and its subcontractors, a determination for either the plaintiff or the contractor would obviate the need for further litigation between the plaintiff and the subcontractor. *Id.*

Here, the same rationale applies. Given that the issue subject to arbitration between Plaintiffs and Sierra is whether Sierra breached the MSA by providing its professional services in a manner that failed to meet the appropriate standard of care, (*see* Doc. 1-1 at ¶ 6; *see also* Doc. 19 at 4 ("[T]he Complaint merely duplicates the underlying dispute currently being arbitrated in Georgia.")), a determination in favor of either Plaintiffs or Sierra will render further litigation between Plaintiffs and Mr. Robinson on this issue duplicative because Sierra is responsible for Mr. Robinson's conduct under the doctrine of *respondeat superior*. Accordingly, like the *Post* court, this Court finds that no matter how the issues in arbitration between Plaintiffs and Sierra are resolved, their resolution will directly affect the claims asserted by Plaintiffs against Mr. Robinson. *See Post*, 429 So. 2d at 1215. Accordingly, even if Florida law controlled here, as Plaintiffs propose, the arbitration agreement between Plaintiffs and Sierra Piedmont would apply to Plaintiffs claims against Mr. Robinson.

### B. Plaintiffs have cited to no Florida caselaw directing this Court to construe the MSA so narrowly that a non-signatory agent of a signatory would be precluded from compelling arbitration related to his provision of the services outlined in the MSA.

Plaintiffs next argue that the MSA's arbitration clause should be construed narrowly because it states that it "applies *only* to claims by R&L Carriers *against Sierra Piedmont*, and, even then, only to disputes between them regarding *their*

11

*contract.*" (Doc. 27 at 10–11 (emphasis in original)). To support this argument, Plaintiffs cite *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354 (11th Cir. 2017) for the proposition that "[w]here an arbitration provision is narrowly drawn to include only specific parties or disputes, those limitations will be enforced." (*See* Doc. 27 at 9–10). But as this Court reads it, *Kroma* does not call for the type of strict construction that Plaintiffs suggest is appropriate here.

In *Kroma*, non-signatories to a licensing agreement attempted to compel arbitration of a plaintiff's claims against them by using Florida's doctrine of equitable estoppel. *See Kroma*, 845 F.3d at 1354. Under the doctrine of equitable estoppel, "a defendant who is a non-signatory to an agreement containing an arbitration clause can force arbitration of a signatory's claims when 'the signatory . . . must rely on the terms of the written agreement in asserting its claims against the nonsignatory.'" *Id.* (citing *Allscripts Healthcare Sols., Inc. v. Pain Clinic of Nw. Fla., Inc.*, 158 So. 3d 644, 646 (Fla. 3d DCA 2014)). But equitable estoppel is only one of many theories under which a non-signatory to a contract may compel arbitration. *See Sunkist*, 10 F.3d at 756–57. Another "limited exception[ ] . . . that allow[s] nonsignatories to a contract to compel arbitration" results from the application of agency principles. *See id.*; *see also MS Dealer*, 177 F.3d at 947.

Thus, while under an equitable estoppel theory as applied in *Kroma*, a defendant who is not considered a party to the agreement within the scope of the arbitration clause cannot compel arbitration of the claims asserted, this analysis is

12

not appropriate here given the agency principles at play. That is, because the defendants in *Kroma* who were seeking to compel arbitration were not agents of the signatory to the arbitration agreement, and the allegations against them did not arise out of the services provided by the signatory to the agreement, they could not compel arbitration. But the opposite is true here as Mr. Robinson is an agent of Sierra and the claims against him arise out of the services he provided—which were outlined in the MSA—pursuant to his employment with Sierra. Thus, because Plaintiffs have cited no Florida caselaw directing this Court to construe the MSA as narrowly as Plaintiffs would prefer, the Court will not heed Plaintiffs' call for strict construction.

### C. Plaintiffs' professional negligence claim is subject to arbitration even though it is based on common law negligence principles.

Last, Plaintiffs argue that because this case is not a claim by R&L carriers against Sierra Piedmont, and because Plaintiffs' claims "are solely based on the common law duties that Mr. Robinson owed to Plaintiffs based on his status as a professional engineer," they are unrelated to the MSA. (Doc. 27 at 11). This argument also fails, however. Under Florida law, to which Plaintiffs cite in support of their arguments, arbitration clauses may apply to malpractice claims against non-signatories to the agreement where the non-signatory is an employee of a signatory. *See Giller v. Cafeteria of S. Beach Ltd., LLP*, 967 So. 2d 240, 242 (Fla 3rd DCA 2007) (holding that arbitration clause in agreement defining services to be rendered in architectural contract between commercial property management company and architectural services firm applied to malpractice claim against

13

individual architect even though individual architect was not a signatory to the services contract).  While Mr. Robinson is not named specifically in the Complaint, the duties he is alleged to have breached were imposed by the MSA between Plaintiffs and Sierra Piedmont.  For example, the MSA states "Sierra's professional services will be performed, findings obtained, and recommendations prepared in accordance with that level of care and skill ordinarily exercised by members of the profession currently practicing under similar conditions."  (Doc. 1-1 at ¶ 6).  The MSA further states, "[i]n the event Sierra's performance of the work, or any portion thereof, fails to conform to the above standard of care, Sierra shall, at its expense and as the sole remedy for such failure, proceed either to re-perform the nonconforming work or Sierra may elect to refund." (*Id.*).  Accordingly, the contract clearly states the standard of care that the parties expected Sierra Piedmont's professional services to be performed in accordance with.  And implicit in this portion of the contract is the recognition that Sierra Piedmont's employees, with whom—as the contract later states—"Client . . . in the course of this engagement . . . may learn about . . . and may develop working relationships with" are the individuals providing the professional services.  (*Id.* at ¶ 16).

     Thus, to the extent that Mr. Robinson delivered his services with a standard of care below that level of care ordinarily exercised by professional engineers providing similar services, such negligence was clearly contemplated by the MSA. If Plaintiffs were able to bring suit against Mr. Robinson individually for professional negligence, such a legal action would effectively render the MSA

toothless as there is no distinction between the services provided under the MSA and the allegedly negligent provision of those services complained of in the Complaint.  *See Bre/Cocao Beach Owner, L.L.C. v. Rolyn Cos.*, No. 6:12-cv-466-Orl-22GJK, 2013 WL 12159257, at *8 (M.D. Fla. Mar. 6, 2013) (explaining, "[t]hus, as it relates to Rolyn's claim for Porter's alleged professional negligence during his employment with AMEC, Rolyn is raising allegations of substantially interdependent and concerted misconduct by Porter and AMEC such that not compelling arbitration would render arbitration between AMEC and Rolyn meaningless").  Accordingly, Plaintiffs' professional negligence claim (Count I) against Mr. Robinson is subject to arbitration.

## CONCLUSION

For the foregoing reasons, Defendant Gerald Robinson's Motion to Dismiss is **GRANTED**.  The Court finds that based on the allegations made in Plaintiffs' Complaint, Plaintiffs' claims against Mr. Robinson are subject to the arbitration agreement between Plaintiffs and Sierra in the MSA.

Accordingly, it is **ORDERED** that:

1. Defendant Gerald Robinson's Motion to Dismiss (Doc. 19) is **GRANTED**.
2. Plaintiffs' Complaint (Doc. 1) is **DISMISSED** without prejudice.
3. Defendant Gerald Robinson's Motion to Stay Discovery (Doc. 32) is **GRANTED**. The Clerk of Court is **DIRECTED** to **STAY** and **ADMINISTRATIVELY CLOSE** this case and place a **STAY FLAG** on the file until further order.

4. On or before September 5, 2023, and every ninety (90) days thereafter, the parties are **DIRECTED** to file a joint notice as to the status of arbitration and this case.

**ORDERED** at Tampa, Florida on June 5, 2023.

_____
JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE